Filed 4/10/13  P. v. Willams CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RONALD WILLIAMS,<br><br>    Defendant and Appellant. | F063696<br><br>(Super. Ct. No. VCF248957A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Valeriano Saucedo, Judge.

Peter Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P.J., Poochigian, J., and Peña, J.

Appellant, Ronald Williams, pled no contest to possession of methamphetamine for sale (count 1/Health & Saf. Code, § 11378), being under the influence of methamphetamine (count 2/Health & Saf. Code, § 11550, subd. (a)), and possession of narcotics paraphernalia (count 3/Health & Saf. Code, § 11364, subd. (a)). Williams also admitted an allegation in count 1 that he had a prior conviction for violating Health and Safety Code section 11370.2, subdivision (c) and two prior prison term enhancements (Pen. Code, § 667.5, subd. (b)).

On October 17, 2011, the court sentenced appellant to a four-year term with the final year of the term to be served on mandatory supervision.

On appeal, appellant contends the court erred when it denied his motion to suppress. We affirm.

**FACTS**

The testimony and other evidence submitted in connection with appellant's motion to suppress evidence established that on September 26, 2010, at approximately 8:30 p.m., Kingsburg Police Dispatcher Mayra Caldera received a 911 call from a caller who stated that he heard noise in the room next door and that someone was hitting, stabbing or trying to kill his wife in room 310 of the Kings Inn Motel. The caller gave Caldera the address of the motel, which is located off Highway 99. The call came from a pay phone at the Kings Deli in Kingsburg.

Caldera determined that the motel was in the jurisdiction of the Tulare County Sheriff's Department and transferred the call within seconds. Caldera told the caller not to hang up, but the caller hung up anyway. Caldera told the sheriff's department that there was someone in room 310 at the motel either killing, stabbing, or hitting his wife.

Tulare County Sheriff's Dispatcher Melinda Mathews received the call from Caldera and dispatched Sheriff's Deputy Robert Hadley to the Kings Inn Motel. Deputy Hadley drove to the Kings Inn Motel and pulled up to room 310, which was dark with the

2

air conditioner on. He knocked on the door three separate times, waiting 30 to 60 seconds before knocking again, but he did not receive any response. Deputy Hadley got a key to the room from the night manager and knocked on the door again. When he again received no response, Deputy Hadley used the key to open the door to check on the welfare of the woman who had reportedly been assaulted or killed. Hadley then saw Williams lying on a bed that was about 10 feet away from the door and a second man lying on a bed that was closer to the door. He reached over and turned on the light so he could see more clearly. He was then able to see a large roll of currency and a large plastic baggie containing methamphetamine at Williams's feet.

Deputy Hadley detained both men in handcuffs. After Williams told him he was on parole, the deputy searched the room and found a scanner on top of a nightstand, a baggie containing methamphetamine in a drawer, a baggie containing marijuana in another drawer, and a glass pipe for smoking methamphetamine on Williams's bed. Williams exhibited signs of being under the influence of a controlled substance.

## DISCUSSION

Williams contends the court erred when it denied his suppression motion because the anonymous telephone tip did not justify the warrantless entrance into his motel room. Respondent contends that the entry into the room was justified by exigent circumstances. We agree with respondent.

> "Motel guests are entitled to the same Fourth Amendment protections against unreasonable searches and seizures as are homeowners. [Citations.]" (*People v. Jenkins* (2004) 119 Cal.App.4th 368, 373-374.)

> "'[T]he "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."' [Citation.] Thus, 'searches and seizures inside a home without a warrant are presumptively unreasonable.' [Citation.] 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.' [Citation.] In particular, 'law enforcement officers may enter a home without a warrant to render emergency assistance

3

to an injured occupant or to protect an occupant from imminent injury.' [Citation.]" (*People v. Troyer* (2011) 51 Cal.4th 599, 602.)

"In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards. [Citation.] … Because a warrantless entry into a home is presumptively unreasonable, the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. [Citation.]

"'[P]olice may enter a home without a warrant *when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury*.' [Citation.] '"The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."' [Citation.] '"'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.'"' [Citation.] On appeal, we uphold the trial court's factual findings if they are supported by substantial evidence, but review independently its determination that the search did not violate the Fourth Amendment. [Citation.]

"The '"emergency aid exception"' to the warrant requirement 'does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' [Citation.] Rather, *the exception 'requires only "an objectively reasonable basis for believing ..." [citation] that "a person within [the house] is in need of immediate aid*."' [Citation.] 'We are to approach the Fourth Amendment ... with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way.' [Citation.]" (*People v. Troyer*, *supra*, 51 Cal.4th at pp. 605-606, italics added.)

In *Florida v. J.L.* (2000) 529 U.S. 266, the United States Supreme Court held that an anonymous telephone tip in that case, which reported that a young Black male standing at a bus stop in a plaid shirt "[is] carrying a gun" was insufficient—without more—to justify a detention and patdown search of the individual. (*Id*. at p. 268.) In that case, there was no audio recording of the tip, nothing was known about the informant, and it was unknown how long it took the police to respond to the tip. Upon their arrival,

4

the police officers observed no suspicious conduct on the part of the individual and there was no indication he might have been carrying a gun. (*Ibid*.) The court recognized that there are situations, as in the case of *Alabama v. White* (1990) 496 U.S. 325 (*White*), where "an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" (*Florida v. J.L.*, *supra*, at p. 270.) In *White*, predictive information in the tip was corroborated by the police and thus provided a reasonable basis to think the informant had inside knowledge about the suspect. (*Florida v. J.L.*, *supra*, at pp. 270-271.) In contrast, the tip in *Florida v. J.L.* "lacked the moderate indicia of reliability present in *White* .…" (*Id*. at p. 271.) "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." (*Ibid*.) Hence, the detention and search in that case were incompatible with the Fourth Amendment.

In *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*), an unidentified 911 caller reported that an African-American male had "'just pulled a gun'" on him and had mentioned a gang name. The caller said he believed the perpetrator was about to shoot him. The caller specifically described the perpetrator, the parked vehicle the perpetrator was sitting in, and gave an exact location. When the police officers arrived at that location a few minutes later, they found the vehicle and a man sitting inside who matched the description provided by the caller. The officers asked him to get out of the car, at which time they found a loaded .38-caliber revolver. (*Id*. at p. 462.) The issue before the Supreme Court was whether the anonymous tip was sufficient to justify the defendant's detention. The court concluded the detention was justified by reasonable suspicion of criminal activity under the totality of the circumstances. (*Id*. at pp. 465-466.)

In reaching this conclusion, the Supreme Court considered a number of factors bearing upon the reasonableness of the detention and the reliability of the anonymous

call. First, pointing a gun at the caller and threatening to shoot him posed a grave and immediate danger to the caller and anyone nearby. (*Dolly*, *supra*, 40 Cal.4th at p. 465.) Second, "there is no reason to think that anonymous phoned-in tips concerning contemporaneous threats with a firearm are any more likely to be hoaxes than are anonymous phoned-in tips concerning a contemporaneous event of reckless driving," which have been held to provide police with a reasonable suspicion to stop a vehicle. (*Id.* at p. 467.) As to this latter consideration, the court noted that although the caller had not identified himself, the 911 call was taped, which made the call inherently more reliable because it raised the possibility that the caller could be identified by his voice and made it less likely that the call was a hoax or a false report. (*Ibid.*) Third, "the tipster-victim provided a firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Id.* at p. 468.) In elaborating on this third point, the court emphasized that a primary determinant of a tipster's reliability is the basis of his knowledge. (*Ibid.*) Thus, "[t]his case is … unlike *J.L.*, in which the informant 'neither explained how he knew about the [concealed] gun nor supplied any basis for believing he had inside information' [citation] and in which the record did not reveal when the caller discovered the suspect had a concealed weapon or how soon the police responded to the call [citation]. The police 'may ascribe greater reliability to a tip, even an anonymous one, where an informant "was reporting what he had observed moments ago," not stale or second-hand information.' [Citation.]" (*Ibid.*) Fourth, the caller provided a reasonable explanation for wanting to protect his anonymity. (*Id.* at p. 469.)

Here, Dispatcher Caldera testified that the anonymous caller told her he was at the Kings Inn Motel in a room next to room 310 when he heard noises coming from room 310 that led the caller to believe that a man was beating or stabbing a woman in that

6

room.  Although the anonymous call came from a pay phone at a delicatessen located an undisclosed distance away from the Kings Inn Motel, the caller appeared to be reporting something he heard shortly before calling 911, and, as in *Dolly*, the call was recorded which enhanced its reliability.  However, unlike the call in *Dolly* which indicated that the defendant merely posed a danger to the caller or the public, the situation here was more urgent because it posed the real possibility a woman had already been beaten or stabbed and might require immediate medical attention.  Thus, given the urgency of the situation and that the reliability of the anonymous call was enhanced because it was recorded, Deputy Hadley had an objectively reasonable basis for believing that someone in room 310 was in need of immediate aid.

Williams contends there were no exigent circumstances in the present case because there was no indication that the caller personally saw or heard anything, some of the caller's statements were based on inference, i.e., that a woman was being beaten or stabbed, and the deputy did not observe anything at the motel that indicated that an assault had occurred.  Williams also cites *People v. Ormonde* (2006) 143 Cal.App.4th 282 (*Ormonde*), where entry into a home was found to be unlawful, as the case most factually similar to the instant case and which he alleges had stronger facts justifying entry into the home, to contend that his suppression motion should have been granted.  We disagree and find *Ormonde* inapposite.

It is apparent from the information relayed by the caller that he was reporting noises he personally heard coming from an adjoining motel room soon after hearing the noises.  Further, although the caller's statement that a woman was being beaten or stabbed was conclusory, it nevertheless raised the specter that someone in room 310 was undergoing a vicious attack and in need of immediate medical assistance.  That Officer Hadley did not initially hear anything inside the motel room did not eliminate the need to check the room because by the time he arrived, the victim could have been silent because

7

she was unconscious or any sound she made could have been drowned out by the sound of the air conditioner. Moreover, although Deputy Hadley did not see anything suspicious when he opened the door to room 310, he was justified in turning the light on and entering the room because he still had to check the room's interior, including the bathroom, to determine whether a victim was inside.

*Ormonde* does not assist Williams. In that case, a woman called from the corner of the block where Richard Ormonde's apartment was located to report that she had gotten in a fight with her estranged husband, Christopher Olson, and that Olson had pushed her and kicked her in the stomach. When two officers arrived at Ormonde's apartment, Olson was standing next to a car, 10 feet away from the apartment's front door, which was open. After arresting Olson, an officer entered the apartment and took three steps inside before Ormonde, his girlfriend, and a small child came out from the back of the apartment. The officer had them step outside and eventually he obtained permission from Ormonde to search a dresser and a backpack where drugs belonging to Ormonde were found. (*Ormonde*, *supra*, 143 Cal.App.4th at pp. 286-289.)

In reversing the denial of Ormonde's suppression motion the *Ormonde* court found that exigent circumstances did not justify the initial entry into the house because the domestic violence victim was outside of the apartment, the estranged husband was arrested outside the apartment, none of the officers who testified articulated any reason to believe that there were any other victims or suspects inside the apartment, and none of the violence was reported to have occurred inside the apartment. (*Ormonde*, *supra*, 143 Cal.App.4th at pp. 291-292.)

*Ormonde* is easily distinguishable from the instant case. Here the alleged violence occurred inside room 310 and, prior to entering the room, Deputy Hadley had not determined whether the reported victim was in the room, or whether the alleged victim or

8

anyone else needed assistance.  Accordingly, we conclude that the court did not abuse its discretion when it denied Williams's motion to suppress.

## **DISPOSITION**

The judgment is affirmed.