[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 62 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 63 
OPINION
After the trial court denied a motion to suppress evidence (Pen. Code, §1538.5), Juan Rivera entered a negotiated guilty plea to carrying a concealed dirk or dagger (Pen. Code, § 12020, subd. (a)(4)). The court sentenced him to prison for the two-year middle term. Rivera contends the trial court erred in denying his motion to suppress *Page 64 
 In our original opinion, a majority reversed the judgment, concluding an anonymous tip did not justify the search of a residence and the subsequent detention and arrest of Rivera. The California Supreme Court granted review and reversed, holding that the initial search of the residence was lawful. (People v. Rivera (2007) 41 Cal.4th 304 [59 Cal.Rptr.3d 473, 159 P.3d 60] (Rivera).) The Supreme Court remanded, directing us to consider "whether, after the officers' legitimate entry, their detention and search of defendant was proper under the Fourth
Amendment." (Id. at p. 311.) We now affirm the judgment.
 FACTS During the afternoon of January 20, 2004, Officer Scott Hunter received a radio report of an anonymous tip that Rivera, who may have had an outstanding warrant, was at an address in Oceanside. Without conducting a records check on the name or seeking any additional information about Rivera or the address provided by the tipster, Hunter and his partner went to the address. Maria Ortega opened the door, identified herself as the property owner and agreed to talk to the officers. Hunter remembered asking Ortega whether she knew Rivera, but could not remember her response. Ortega consented to a search of the residence.
 The officers found Rivera sitting inside a small doorless shed in the backyard. While standing at the shed's opening, Hunter asked for Rivera's name. He answered he was "Juan Rivera." Hunter asked Rivera if he had any weapons. Rivera said he was carrying a knife under his clothing. Hunter ordered Rivera out of the shed and onto the ground. He handcuffed Rivera and then recovered a large sheathed knife from under Rivera's shirt. Hunter then called the police dispatch and confirmed Rivera had an outstanding felony warrant.
 Rivera made a Penal Code section 1538.5 motion to suppress evidence, arguing that the anonymous, uncorroborated tip was insufficient to justify his detention and search and the subsequent verification of the warrant could not support the officers' actions. The trial court took judicial notice of two valid traffic warrants and a parole warrant. After the trial court denied his motion to suppress, Rivera pleaded guilty to carrying a concealed dirk or dagger (Pen. Code, § 12020, subd. (a)(4)) and was sentenced to a two-year prison term.
 DISCUSSION In the original appeal, Rivera argued the uncorroborated anonymous tip did not justify the search of the residence and his subsequent detention and arrest. The California Supreme Court held police are not required to corroborate an *Page 65 
anonymous tip before approaching the residence and asking for consent to search. The Supreme Court held the "knock and talk" procedure used by the officers in this case was a consensual encounter and Ortega's consent justified the officers' entry and search of the residence. The Supreme Court did not decide whether Rivera was thereafter properly detained under the Fourth Amendment of the United States Constitution and remanded for resolution of this issue. (Rivera, supra, 41 Cal.4th at p. 311.) On remand, Rivera contends contacts between the police and individuals occurring in residences must be subjected to a heightened level of scrutiny because privacy within a residence is specifically protected by the United States Constitution. He also contends the "knock and talk" procedure is inherently coercive and he was improperly detained.
 "Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (In re Manuel G. (1997)16 Cal.4th 805, 821 [66 Cal.Rptr.2d 701, 941 P.2d 880]; see Ford v.Superior Court (2001) 91 Cal.App.4th 112, 123 [109 Cal.Rptr.2d 790].) To justify a detention, the police must have a reasonable suspicion the individual is engaged in criminal activity. (Terry v. Ohio (1968)392 U.S. 1, 20 [20 L.Ed.2d 889, 88 S.Ct. 1868].)
 "`[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred." (In re Manuel G., supra, 16 Cal.4th 805, 821.)
 An uncorroborated anonymous tip is not sufficient to justify a detention. (Florida v. J.L. (2000) 529 U.S. 266, 270 [146 L.Ed.2d 254,120 S.Ct. 1375].) In Florida v. J.L., an anonymous tipster informed police over the telephone that "a young black male standing at a particular bus stop and *Page 66 
wearing a plaid shirt was carrying a gun." (Id. at p. 268.) QuotingAlabama v. White (1990) 496 U.S. 325, 329, 327 [110 L.Ed.2d 301,110 S.Ct. 2412], the United States Supreme Court in Florida v. J.L.,supra, 529 U.S. at page 270, recognized that unlike a tip from a known informant whose veracity can be assessed, "`an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity,' [citation]. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits `sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' [Citation.] The question we here confront is whether the tip pointing to [the defendant] had those indicia of reliability."
 Thus, before officers can lawfully search or seize the subject of an anonymous tip, the tip must be corroborated by other evidence. "Corroboration of an anonymous tip can take several forms. For example, `"[e]ven observations of seemingly innocent activity provide sufficient corroboration if the anonymous tip casts the activity in a suspicious light. . . ."' [Citations.] Similarly, `[w]hile a person cannot be detained for mere presence in a high crime area without more [citations], this setting is a factor that can lend meaning to the person's behavior. [Citations.]' [Citation.] Other forms of corroboration include the verification of detail provided by the informant through the officer's observations. Some information is so detailed as to be self-verifying, and in some cases verification from other sources can be achieved. [Citation.]" (People v. Ramirez (1996) 41 Cal.App.4th 1608,1616-1617 [49 Cal.Rptr.2d 311].)
 Heightened Scrutiny for Police Contacts Within Residences It is true that residences are given special protection under the Fourth
Amendment and that the police may not enter a residence without a warrant, the consent of the owner or the existence of exigent circumstances. (See People v. Sanders (2003) 31 Cal.4th 318, 324 [2 Cal.Rptr.3d 630, 73 P.3d 496] ["`"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."' [Citation.] `At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'"]; People v. Robles (2000)23 Cal.4th 789, 795 [97 Cal.Rptr.2d 914, 3 P.3d 311] [warrantless searches of residence are per se unreasonable subject only to a few specifically established and well-delineated exceptions, including consent]; People v. Thompson (2006) 38 Cal.4th 811, 817-818 [43 Cal.Rptr.3d 750, 135 P.3d 3] [exigent circumstances are an exception to the warrant requirement for entry into a residence].) It is also true that the classic description of a consensual encounter mentions a contact between the police and an individual occurring on a street or other public place: "[L]aw enforcement officers do not violate the Fourth
Amendment by merely approaching an *Page 67 individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] If there is no detention — no seizure within the meaning of the Fourth Amendment — then no constitutional rights have been infringed." (Florida v. Royer (1983) 460 U.S. 491, 497-498 [75 L.Ed.2d 229, 103 S.Ct. 1319], italics added.)
 However, as the California Supreme Court made clear in this case, the setting of a public street or other public place is not a prerequisite to a consensual encounter:
 "Consensual encounters may also take place at the doorway of a home. In a frequently cited opinion, one federal appeals court stated more than 40 years ago: `Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof — whether the questioner be a pollster, a salesman, or an officer of the law.' [Citation.] This view `"has now become a firmly-rooted notion inFourth Amendment jurisprudence."' [Citation.] [¶] . . . [¶]
 "The sanctity of the home is not threatened when police approach a residence, converse with the homeowner, and properly obtain consent to search. . . . No heightened level of Fourth Amendment scrutiny arises in this consensual contact . . . because it occurred at a home." (Rivera,supra, 41 Cal.4th at pp. 309, 311.)
 In sum, our Supreme Court has held that consensual encounters are not limited to strictly public places, such as a public street, and that a heightened level of scrutiny should not be applied merely because a police contact occurs at a residence. *Page 68 
 Warnings of the Right to Decline to Talk to the Police Rivera asserts the "knock and talk" procedure is inherently coercive and intrusive, and thus, the police should be required to request consent to speak to individuals within a residence and inform the individual that he or she is free to decline to speak to the officers. Rivera relies heavily on State v. Ferrier (1998) 136 Wn.2d 103 [960 P.2d 927] (Ferrier), where the court held that police conducting a "knock and talk" were required to warn home dwellers of their right to refuse a warrantless search. (Id., 960 P.2d at p. 934.) The Ferrier court stated: "[A]ny knock and talk is inherently coercive to some degree. While not every knock and talk effort may be accompanied by as great a show of force as was present here, we believe that the great majority of home dwellers confronted by police officers on their doorstep or in their home would not question the absence of a search warrant because they either (1) would not know that a warrant is required; (2) would feel inhibited from requesting its production, even if they knew of the warrant requirement; or (3) would simply be too stunned by the circumstances to make a reasoned decision about whether or not to consent to a warrantless search. In this context, Ferrier's testimony, which was supported by the officers, that she was afraid and nervous seems totally reasonable. Indeed, we are not surprised that, as noted earlier, an officer testified that virtually everyone confronted by a knock and talk accedes to the request to permit a search of their home." (Ferrier, supra, 960 P.2d at p. 933.)
 There are several problems with Rivera's reliance on Ferrier, supra,960 P. 2d 927. First, Ferrier was not interpreting the Fourth Amendment of the United States Constitution, but a provision in the Washington State Constitution. (Ferrier, supra, at p. 930.) Second, the Ferrier rule only requires a police warning of the right to refuse consent when the police seek to search a house for contraband or other evidence of a crime and does not apply when the police are seeking entry to question a resident. (State v. Khounvichai (2003) 149 Wn.2d 557 [69 P.3d 862, 865].) As the Khounvichai court explained: "there is a fundamental difference between requesting consent to search a home and requesting consent to enter a home for other legitimate investigatory purposes. When police obtain consent to search a home pursuant to a `knock and talk' they go through private belongings and affairs without restriction. Such an intrusion into privacy is not present, however, when the police seek consensual entry to question a resident. Furthermore, the requirements ofMiranda[v. Arizona (1966)] 384 U.S. [436, 478-479] [16 L.Ed.2d 694,86 S.Ct. 1602], already serve to protect citizens from coercive questioning." (Id., 69 P.3d at pp. 865-866.)
 Third, it is evident that some contacts between police and individuals inside a home are consensual in nature. For example, a police officer *Page 69 
investigating a neighborhood crime could be invited inside by a resident and while talking with that resident about what he or she witnessed, engage in consensual conversations with roommates or family members about whether they saw anything. The fact a police officer asks questions inside a residence does not per se transform a police interaction into a coercive situation and a detention.
 Finally, in Rivera, supra, 41 Cal.4th 304, our Supreme Court implicitly rejected the concept the police must inform a resident of a right to refuse consent or that a heightened scrutiny should be utilized. After noting there was no evidence showing Ortega's consent was involuntary, the court stated, "[a]s this court observed in People v. Ledesma (2006)39 Cal.4th 641, 704 [47 Cal.Rptr.3d 326, 140 P.3d 657], a request to enter and search `by its nature, carries the implication that permission may be withheld.'" (Rivera, at p. 311.)
 In sum, the police were not required to request permission to speak to Rivera or specifically inform him that he had a right to refuse to speak to them.
 The Lawfulness of the Detention Here, the police had been given permission by Ortega to enter and search her residence. Thus, the police had a right to be in the backyard. By looking inside the shed, the police did not violate Rivera's privacy; the shed had no door and he was sitting in plain view. At the time Rivera was contacted, there were only two officers. There was no show of force or assertion of authority. The officers did not have their guns drawn. They did not immediately order Rivera out of the shed or make any other demand of him. Instead, Officer Hunter asked for Rivera's name. This was not an interrogation and Rivera could have declined to answer.
 Once Rivera identified himself, the police had verified a key detail of the anonymous tip, that is, that Rivera was located at Ortega's residence. The officers were then entitled to briefly detain Rivera to verify he had an outstanding warrant.[1] The officers promptly verified the outstanding warrant. *Page 70 
As part of the detention, the police reasonably asked Rivera if he had any weapons. (See Terry v. Ohio, supra, 392 U.S. at p. 27.) Rivera volunteered that he had a knife concealed under his clothing. The police were entitled to remove the weapon for their own safety. In sum, there was a lawful detention.
 DISPOSITION The judgment is affirmed.
 Nares, J., and O'Rourke, J., concurred.
[1] Rivera contends the police lacked reasonable suspicion to detain him for possession of a concealed weapon because Penal Code section 12020, subdivision (a)(4) requires the concealment be in public. The police contacted Rivera not on the basis he had a concealed weapon but based on the anonymous tip that he had an outstanding warrant. To the extent that Rivera is arguing that he was improperly convicted of possessing a concealed weapon, he may not raise that argument on appeal since he pleaded guilty and thereby admitted all the elements of the offense. (SeePeople v. Wallace (2004) 33 Cal.4th 738, 749 [16 Cal.Rptr.3d 96,93 P.3d 1037].) *Page 71