Filed 11/25/24  P. v. Avila CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GARY ARTHUR AVILA, <br><br> Defendant and Appellant. | F087182 <br><br> (Super. Ct. No. RF009129A) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Clara Levers, Alexa Choi and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In September 2023, defendant Gary Arthur Avila pleaded no contest to possession of a firearm by a felon and possession of ammunition by a felon, and he admitted the aggravating factors that he had prior convictions that were numerous or increasing in seriousness and he served a prior prison or jail term. (Pen. Code, §§ 29800, subd. (a)(1), 30305, subd. (a)(1); Cal. Rules of Court, rules 4.421(b)(2)–(3).)[1] As to both counts and in accordance with its previously indicated sentence, the trial court suspended imposition of sentence and placed defendant on probation for two years, with the first 180 days in custody with a referral for work release.

Defendant filed a timely notice of appeal and obtained a certificate of probable cause.

Defendant advances two claims on appeal. First, he claims that the trial court erred when it denied his motion to suppress the firearm and ammunition found during the patdown search because his encounter with police outside his home was not consensual, and there was no reasonable suspicion of criminal activity to justify a detention. Second, he claims the trial court erred when it denied his motion for relief under the California Racial Justice Act of 2020 (§ 745; RJA) without holding a hearing.

The People dispute any entitlement to relief. They contend defendant consented to step outside his house and then consented to be patted down. They also contend the court did not err in denying defendant's RJA motion.

We conclude that the trial court erred when it denied defendant's motion to suppress the firearm and ammunition. We agree with the trial court's implied finding that defendant did not consent to step outside his house to speak with police, and, contrary to the court's finding, no justification existed to detain defendant. Therefore, defendant was entitled to suppression of the firearm and ammunition located during the patdown search.

---

[1] All further statutory references are to the Penal Code.

Accordingly, we reverse the judgment; vacate defendant's convictions; and remand this matter with directions to the trial court to vacate its prior ruling, grant defendant's motion to suppress in its entirety, and conduct further proceedings as appropriate. Our disposition renders defendant's RJA claim moot and we do not reach it.

## DISCUSSION

### I. Procedural Background

#### A. Motion to Suppress

As discussed in more detail below, after being dispatched to defendant's residence for a welfare check, Ridgecrest Police Department officers had defendant step outside, he was patted down, and a firearm with a loaded magazine was located in his pocket. Officers then searched the residence, and they found a box of shotgun shells in the closet and a magazine containing one round of ammunition under the mattress. Defendant filed a motion to suppress the identity of the people in the residence; the .40-caliber pistol, ammunition, and magazine; the shotgun shells; the magazine with one round in it; and any observations by officers and statements made by defendant during the entry, detention, search, and seizure. Defendant argued he was detained without justification, he was frisked without justification, and there was no exigency that justified the warrantless search and seizure.

The prosecutor filed an opposition, arguing that the initial encounter between officers and defendant was consensual, defendant consented to be searched, and defendant's wife, Vanessa P., consented to the search of the residence.

#### B. Hearing on Motion to Suppress

##### 1. Officer Pettit's Testimony

At around 7:20 p.m. in September 2022, two officers with the Ridgecrest Police Department went to the house shared by defendant, his wife, and their three children after the department received a request for a welfare check involving possible domestic

3.

violence against defendant's wife, Vanessa.[2]  Pettit knocked loudly two or three times and announced, "Ridgecrest Police Department."  Eventually a man whom Pettit identified as defendant answered the door wearing only a pair of shorts.

Pettit introduced himself, said he was conducting a welfare check, and asked "if [defendant] could speak with [him]" outside.  Defendant began to back up and "said he wanted to go back inside to change," but Pettit testified that with respect to officer safety and domestic violence, they "try [their] best not to let someone go back into the home …."  Therefore, Pettit asked defendant "to come outside to speak with [him]," and told defendant that "the sooner he spoke with me, the sooner I would let him get about his business."  Pettit did not tell defendant he was free to refuse the welfare check or that he had the right to refuse to come outside, and Pettit conceded he was trying to control whether defendant came outside or went inside.

Defendant then stepped outside and when Pettit asked if he could pat defendant down, defendant consented.  Pettit felt a firearm in defendant's pocket, handcuffed defendant, and removed a .40-caliber handgun from his pocket.  He then placed defendant in the patrol car.  At the time, Pettit had no information that it was illegal for defendant to possess a firearm or that he was on any form of supervision that included search conditions.

### 2. Vanessa's Testimony

Vanessa testified that someone pounded on their door two or three times and did not use their doorbell.  Defendant asked who was there, but there was no answer and no one announced police.  Vanessa testified she was right behind defendant when he

---

**2**  Evidence the police department received a call requesting a welfare check was admitted only to explain Pettit's subsequent conduct.  The prosecutor did not introduce evidence of when the call was received, who called, the contents of the call, or when officers were dispatched, relative to either the call or their arrival at the house.  Defendant's motion to suppress, however, described the call as "a days-old unconfirmed claim that there had been domestic violence in the past."

answered the door, she had no visible injuries, and they were not told police were there for a welfare check. The male officer, Pettit, appeared upset rather than peaceful and calm, but the female officer, Kenney, seemed nice and appeared unbothered.

Officers told defendant he needed to come outside. Defendant asked if he could put clothes on, but he was told no. Vanessa testified this exchange occurred approximately two times and defendant then went outside, where he was searched. Vanessa stated she stepped outside after defendant and was able to hear what was said. She testified the officer did not ask for consent before searching defendant and defendant did not give consent. Vanessa refused to speak with the male officer, but she later spoke with the female officer. She was upset and did not recall whether she gave consent to search their house.

### 3. Natalie's Testimony

Vanessa's oldest daughter, Natalie, was in her bedroom when she heard loud knocking at the door. She did not hear the doorbell ring. Vanessa came down the hallway and saw her parents at the front door. She did not hear anyone say anything about a welfare check. When defendant walked outside, she could see it was the police and they were acting aggressively.

### C. Trial Court's Ruling

The trial court granted in part and denied in part defendant's motion to suppress. The court concluded the prosecutor had not met her burden of demonstrating Vanessa consented to the search of the residence[3] and, therefore, the court excluded the shotgun shells and magazine located inside the house.

With respect to the initial encounter between defendant and Pettit, and the subsequent patdown, the court denied the motion to suppress. The court reasoned, "[T]hey knocked on the door. Obviously they're knocking hopefully loud enough for

---

[3] Pettit did not have firsthand knowledge of whether Vanessa consented.

5.

people to hear.  They had to knock 2 to 3 times before somebody responded to the door.

Then when they were met at the door, it is an individual wearing only shorts.  Apparently

he [had] underwear on as well, but no shirt and no other clothing.  *They asked him to step*

*out, and he wants to leave their presence*.  And for officer safety purposes, it was testified

to that Officer Pettit did not want the subject to step away, and he indicated that he would

like him to come out so they could talk, and I think that that was appropriate under the

circumstances, and an appropriate investigation.  There was no evidence that there was

any force used.  There was no evidence that there was any coercion in the way of drawing

of weapons, of placing hands-on [defendant], nor was there any evidence that the

entryway was breeched [*sic*] by law enforcement or to extract [defendant].  Once outside

to have that discussion, again I think it is appropriate to conduct a cursory pat-down for

possible weapons, and that is what occurred here.  And I do not believe that that would be

violative of any privacy right that was unreasonably breeched [*sic*] given the

circumstances and given the need to protect the safety of all those involved.  And so I

find that the officer was reasonable and did not create a Fourth Amendment violation and

commit an illegal search .…"  (Italics added.)

## II.    Legal Principles

"The Fourth Amendment provides in relevant part that the 'right of the people to

be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated.'  The Amendment establishes a simple baseline, one that

for much of our history formed the exclusive basis for its protections:  When 'the

Government obtains information by physically intruding' on persons, houses, papers, or

effects, 'a "search" within the original meaning of the Fourth Amendment' has

'undoubtedly occurred.'"  (*Florida v. Jardines* (2013) 569 U.S. 1, 5 (*Jardines*).)

"Police contacts with individuals may be placed into three broad categories

ranging from the least to the most intrusive:  consensual encounters that result in no

restraint of liberty whatsoever; detentions, which are seizures of an individual that are

strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manual G.* (1997) 16 Cal.4th 805, 821.) At issue in this case, consensual encounters between police and individuals may occur on the street, other public places, or in the doorway of a home. (*People v. Rivera* (2007) 41 Cal.4th 304, 309 (*Rivera*).) "Consensual encounters require no articulable suspicion of criminal activity" (*ibid.*), and do not violate the Fourth Amendment "as long as circumstances are such that a reasonable person would feel free to leave or end the encounter" (*ibid.*).

"It is settled that a person may decline to engage in a consensual encounter with police. 'The person approached … need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.' [Citations.] Such 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' [Citations.] The reason that a truly consensual encounter does not implicate the Fourth Amendment is that the officer is simply approaching a person in a public place and engaging in '"personal intercourse."' [Citations.] Officers, like others, may do so. But the officer must have legal cause to command the civilian's attention and cooperation." (*People v. Flores* (2024) 15 Cal.5th 1032, 1043–1044, fn. omitted (*Flores*).) "A detention occurs when the officer, by means of force or show of authority, has restrained a person's liberty. (*Terry v. Ohio* (1968) 392 U.S. 1, 19, fn. 16.) Unlike a consensual encounter, a detention must be supported by reasonable suspicion the person is involved in criminal activity." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 56.)

"Where, as here, the prosecution relies on consent to justify a warrantless search or seizure, it bears the 'burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.]' [Citation.] Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure. [Citations.]

Where an illegal detention occurs, unless 'subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent is' ineffective." (*People v. Zamudio* (2008) 43 Cal.4th 327, 341 (*Zamudio*); accord, *In re J.G.* (2014) 228 Cal.App.4th 402, 408 (*J.G.*).)

""""In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment."" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232.) In doing so we do not consider each fact in isolation. Instead, 'we must consider "the totality of the circumstances—the whole picture."'" (*Flores, supra*, 15 Cal.5th at p. 1043.)

## III. Analysis

This case does not involve any arguable evidence of reasonable suspicion of criminal activity justifying a brief investigative detention and it does not involve any arguable evidence of exigent circumstances. On appeal, the focus of the parties' disagreement is whether defendant stepped outside his front door during the course of a consensual encounter with Pettit or whether he was instead unlawfully detained. Defendant argues that the trial court found the encounter was not consensual, stating, "They asked him to step out, and he wants to leave their presence," and then justified the detention as reasonable, in error.

Recognizing infirmities in the record, the People rely on the principle that "An appellate court shall affirm a trial court's ruling if justified by any sound legal principle, even if the trial court based its decision on a different principle." (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364–365 ["'On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.'"].) The People argue that notwithstanding the court's reliance

on "general reasonableness or *Terry* stop and frisk principles,"[4] defendant consented to exit his house and speak with Pettit.

As previously stated, officers went to defendant's house after the police department received a request for a welfare check, but the circumstances underlying the request, including who made it, when it was received, and what details were relayed, are not part of the record. There was no evidence that police saw or heard anything at the house that aroused suspicions, and no evidence that anyone, including Vanessa, was injured. Pettit acknowledged that when he asked defendant to talk to him outside, defendant started to back up and asked if he could change clothes. Pettit testified that he accepted defendant's representation that he wanted to put more clothes on and he had no reason to believe defendant was armed, but he did not want to allow defendant to retreat into the house because of general safety concerns.

We agree with defendant that the trial court, at least impliedly, found he did not consent to step outside and speak with the officers, and we concur with the court's conclusion in this regard. "'[W]hen it comes to the Fourth Amendment, the home is first among equals.' [Citation.] 'At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."'" (*Collins v. Virginia* (2018) 584 U.S. 586, 592, quoting *Jardines, supra*, 569 U.S. at p. 6.) "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." (*Kentucky v. King* (2011) 563 U.S. 452, 469–470.) "And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." (*Id.* at p. 470.)

---

**4**    *Terry v. Ohio* (1968) 392 U.S. 1, 20 (*Terry*).

9.

Here, defendant answered the door after someone knocked loudly; found two police officers on the other side, one of whom looked "upset" or "aggressive" and asked him to come outside; and responded by stepping backward and asking if he could put some clothes on. Pettit did not tell defendant he could refuse the welfare check or refuse to come outside, and he did not want to allow defendant to retreat inside his house, so he told defendant to come outside. Under the totality of the circumstances, as the trial court found, a reasonable person would not have felt free to shut the door on Pettit or otherwise refuse to cooperate. (*Rivera, supra*, 41 Cal.4th at p. 309.) That Pettit did not display a weapon, threaten defendant, or make accusatory inquiries, as the People argue, does not alter this conclusion. Defendant communicated his desire "to leave [police] presence," as the trial court recognized, and he stepped outside not voluntarily, but as a result of Pettit's "show of authority" (*People v. Zaragoza, supra*, 1 Cal.5th at p. 56) as a police officer who gave no indication defendant could terminate the encounter and who instead, in an attempt to control whether defendant retreated or came outside, twice rebuffed defendant's request to change clothes and told him to come outside.

Rather than relying on consent, the trial court found Pettit's actions and investigation "appropriate" and "reasonable." However, """A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.""" (*People v. Suff* (2014) 58 Cal.4th 1013, 1053–1054.) The People do not attempt to defend the encounter as a lawful detention, and the record is devoid of support for a finding that police had "[a]n articulable and reasonable suspicion that [defendant was] engaged in criminal activity …." (*Flores, supra*, 15 Cal.5th at p. 1045; accord, *Suff, supra*, at pp. 1053–1054.)

The People also do not argue that if we find defendant was unlawfully detained, he nevertheless consented to be patted down. "Where an illegal detention occurs, unless

'subsequent events adequately dispel the coercive taint of the initial illegality, i.e., where there is no longer causality, the subsequent consent is' ineffective." (*Zamudio, supra*, 43 Cal.4th at p. 341; accord, *People v. Casares* (2016) 62 Cal.4th 808, 838, disapproved on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Pettit testified that defendant consented to be patted down, while Vanessa testified she could hear what was being said and defendant did not consent and was not asked to consent. Regardless, the patdown search followed right after defendant stepped outside and there is no support in the record for a finding that consent was sufficiently attenuated to dispel the taint of the unlawful detention. (*Zamudio, supra*, at p. 341; *People v. Lujano* (2014) 229 Cal.App.4th 175, 188–189; *J.G., supra*, 228 Cal.App.4th at p. 408; *People v. Werner* (2012) 207 Cal.App.4th 1195, 1211–1212.) Therefore, we conclude the trial court erred in denying defendant's motion to suppress the firearm and ammunition.

Finally, the parties do not address prejudice, but given that defendant's two convictions arise out of his possession of the firearm and ammunition discovered during the patdown search, the trial court's erroneous denial of defendant's motion to suppress is unquestionably prejudicial. (*J.G., supra*, 228 Cal.App.4th at p. 408, citing *People v. Neal* (2003) 31 Cal.4th 63, 86 [constitutional error measured under *Chapman v. California* (1967) 386 U.S. 18, 24].) We reverse the judgment, vacate defendant's convictions, and remand the matter so the trial court may vacate its ruling and grant the motion to suppress in full.

**DISPOSITION**

The judgment is reversed and defendant's convictions are vacated. This matter is remanded with directions for the trial court to vacate its prior ruling and grant defendant's motion to suppress in its entirety. The court shall conduct further proceedings as necessary.

MEEHAN, J.

WE CONCUR:

PEÑA, Acting P. J.

DeSANTOS, J.

12.